1
2
3
4

Hart L. Robinovitch , AZ Bar No. 020910
ZIMMERMAN REED, PLLP
14646 N. Kierland Blvd, Suite 145
Scottsdale, AZ 85254
(480) 348-6400
(480) 348-6415 Facsimile
E-mail: Hart.Robinovitch@zimmreed.com

5
6
7
8
9
10

Christopher P. Ridout, CA Bar No. 143931
*Pending Admission Pro Hac Vice*
Caleb LH Marker, CA Bar No. 269721
*Pending Admission Pro Hac Vice*
RIDOUT & LYON, LLP
555 Ocean Boulevard, Suite 500
Long Beach, CA 90802
(562) 216-7380
(562) 216-7385 Facsimile
E-mail: c.ridout@ridoutlyonlaw.com
       c.marker@ridoutlyonlaw.com

11

12

# UNITED STATES DISTRICT COURT

13

## DISTRICT OF ARIZONA

| | |
|---|---|
| 14 ERIC MITCHELL, individually and on behalf of all others similarly situated, | CASE NO: |
| 15 | **COMPLAINT (CLASS ACTION)** |
| 16 Plaintiff, | 1) **NEGLIGENCE;** |
| 17 vs. | 2) **VIOLATION OF ARIZONA CONSUMER FRAUD ACT; AND,** |
| 18 GODADDY.COM, LLC, a Delaware limited liability company; and, GO DADDY OPERATING COMPANY, 19 LLC d/b/a "GO DADDY", a Delaware limited liability company, | 3) **BREACH OF CONTRACT** |
| 20 Defendants. | |
| 21 | (JURY TRIAL DEMANDED) |
| 22 | |

23

    Plaintiff Eric Mitchell ("Plaintiff") brings this action, by and through his

24 undersigned counsel, on behalf of himself and all other similarly situated persons in

25 the class defined below, based upon information and belief and the investigation of

26 counsel, except for information based upon personal knowledge, and hereby allege

27 as follows:

28

1

I.      **NATURE OF ACTION**

2      1.      Plaintiff brings this class action on his own behalf and on behalf of all

3 persons in the United States against Defendants GoDaddy.com, LLC and Go Daddy

4 Operating Company, LLC d/b/a "Go Daddy" (collectively referred to herein as

5 "Defendants") to redress Defendants' failure satisfy its guaranteed upload times for

6 customers' Domain Name Service ("DNS"), web sites and email accounts, causing

7 injury and loss to the Class.  More specifically, this action arises from the events of

8 September 10, 2012 that resulted in Plaintiff's DNS and websites being inaccessible

9 and preventing the transmission of e-mail messages to and from Plaintiff's e-mail

10 accounts registered and maintained by Go Daddy.

11      2.      As reported on FOXNews.com on September 10, 2012, "A malicious

12 flood of network traffic temporarily knocked Internet registrar GoDaddy's servers

13 offline Monday -- taking with it the site, its email, and thousands, potentially

14 millions of websites registered through one of the Internet's most popular services."[1]

15      3.      Reuters confirmed the outage, noting that:

16      Go Daddy, one of the world's biggest Internet hosting companies and
       website registration companies, blamed technical problems for a nearly
17      six-hour service disruption that affected some of its more than 10
       million customers on Monday.[2]
18

19      4.      Because of Defendants' actions, more than five million websites and

20 associated e-mail accounts were taken offline.

21      II.      **JURISDICTION AND VENUE**

22      5.      This Court has jurisdiction over this action pursuant to 28 U.S.C

23 §1332(d), as the matter in controversy exceeds $5 million, Plaintiff has diverse

24 citizenship from Defendants, and none of the exceptions apply.

25

26 [1]  http://www.foxnews.com/tech/2012/09/10/every-godaddy-registered-site-temporarily-offline/
#ixzz266hg6U7u (a true and correct copy of the article has been attached hereto as Exhibit A).

27 [2] http://in.reuters.com/article/2012/09/11/net-us-godaddy-outage-idINBRE88916720120911 (a true
and correct copy of the article has been attached hereto as Exhibit B).

28

6.    Venue is appropriate in this Court.  Upon information and belief, each Defendant maintains a principal place of business and its "nerve center" in Scottsdale, Arizona, which is in this Judicial District.  Defendants transact business in this Judicial District and certain events and conduct giving rise to the claims in this action occurred in this Judicial District.  In addition, Paragraph 19 of Go Daddy's Terms of Use state that "any action relating to or arising out of these Terms of Use shall be brought in the state or federal courts of Maricopa County, Arizona, and you hereby consent to (and waive all defenses of lack of personal jurisdiction and *forum non conveniens* with respect to) jurisdiction and venue in the state and federal courts of Maricopa County, Arizona."[3] Each Defendant has sufficient minimum contacts in the State of Arizona or otherwise intentionally prevails itself of the Arizona market through television, radio and internet advertising located in Arizona and other activities, so as to render the exercise of jurisdiction over it by the Arizona courts consistent with traditional notions of fair play and substantial justice.

### III.   THE PARTIES

7.    Plaintiff Eric Mitchell ("Mitchell") is an adult individual who resides in the State of California, County of Los Angeles.

8.    At all relevant times during the class period, like other class members, Mitchell maintained a subscription to, had websites hosted, had e-mail accounts with Defendants, and/or purchased other services sold by Defendants pursuant to contract.

9.    Upon information and belief, GoDaddy.com, LLC ("GD.com") is a limited liability company organized and existing under the laws of the State of Delaware with its principle place of business located at 144555 North Hayden Road, Scottsdale, Arizona.  Additionally, upon information and belief, GD.com's members all reside in Arizona, and are thus citizens of Arizona.  GD.com's resident agent in

---

[3] http://www.godaddy.com/agreements/showdoc.aspx?pageid=TOU&ci=20801&app_hdr=0 (a true and correct copy of the Terms of Use has been attached hereto as Exhibit C).

Arizona is Sherlynn Delgado and maintains a registered office at 14455 North Hayden Road, Suite 219, Scottsdale, Arizona 85260.

10.    Go Daddy Operating Company, LLC ("GDOC") is a limited liability company organized and existing under the laws of the State of Delaware with its principle place of business located in Scottsdale, Arizona.   Additionally, upon information and belief, GDOC's members all reside in Arizona, and are thus citizens of Arizona.  GDOC's resident agent in Delaware is the Corporation Trust Company and maintains a registered office at 1209 Orange Street, Wilmington, Delaware 19801.

11.    Both GD.com and GDOC are collectively referred to herein as "Go Daddy" or the "Defendants."

12.    Plaintiff is informed and believes that Defendants regularly conduct business in the State of Arizona directly or indirectly through subsidiaries owned, licensed, operated, administered, managed, directed and/or controlled in the State of Arizona.   Defendants' business practices, business policies and major business decisions, including those challenged and at issue here, originate at their offices in Arizona and emanate to other states, harming consumers there (including, for instance, Plaintiff in California).

### IV.    FACTUAL ALLEGATIONS

13.    Go Daddy is an Internet domain registrar and web hosting company. As an Internet domain registrar that allows customers to purchase domain names (Internet addresses ending in ".com", etc.), Go Daddy is the world's largest registrar with more than 53 million domain names under management.   As a web hosting company, Go Daddy is the "largest hosting provider of secure websites in the world."[4]  Go Daddy also provides Premium DNS services to Class members.

---

[4] http://www.godaddy.com/newscenter/about-godaddy.aspx?isc=wstapp605d&ci=9079.

14.   Founded in 1997 as Jomax Technologies, Go Daddy currently serves more than 10.5 million customers with more than 40 product offerings supported by its more than 3,200 employees.

15.   Go Daddy has gained widespread awareness through its extensive marketing efforts, which Go Daddy's CEO has referred to as "fun, edgy, and a bit inappropriate."[5]  Such advertising typically features women such as NASCAR driver Danica Patrick, WWE wrestler Candice Michelle, motorcycle racer Valerie Thompson, and other "Go Daddy Girls."

16.   In addition to acting as a registrar, Go Daddy offers web hosting services for over five million websites.  "A web hosting service is a type of Internet hosting service that allows individuals and organizations to make their website accessible via the World Wide Web."[6]

17.   Go Daddy offers a variety of Web hosting plans that range in price from a low of $7.64 per month (with a thirty-six month contract) for a shared plan (multiple customers using the same server) to $299.99 per month for a dedicated server.

18.   All of Go Daddy's web hosting plans are listed on its website along with current pricing information.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[5] http://www.bobparsons.me/archive_article.php?entry_id=142

[6] http://en.wikipedia.org/wiki/Web_hosting

19.    At the top of each web page discussing the details of the web hosting plan and pricing, Go Daddy displays an image of a golden seal stating "99.9% UPTIME GUARANTEE on network" ("Golden Seal"):



20.    Wikipedia defines "Uptime" as follows:

"Uptime" is the measure of time a machine has been up without any downtime.  It is often used as a measure of computer operating system reliability or stability, in that this time represents the time a computer can be left unattended without crashing, or needing to be rebooted for administrative or maintenance purposes.[7]

21.    For example, if a computer server fails to operate, and therefore is "down", for ten minutes during a 24-hour period of time (or 1,440 minutes) its "uptime" would be 99.305%.

22.    Go Daddy's Golden Seal appears on numerous pages of their website, including but not limited to Web Hosting (http://www.godaddy.com/hosting/web-hosting.aspx), Virtual Dedicated Servers (http://www.godaddy.com/hosting/virtual-

---

[7] http://en.wikipedia.org/wiki/Uptime

1  dedicated-servers.aspx),   Dedicated   Servers   (http://www.godaddy.com/hosting/

2  dedicated-servers.aspx):



16    23.    Go Daddy also advertises and represents that its e-mail services feature

17  "99.9%   availability,   backups   and   redundancy"   (http://www.godaddy.com/

18  email/email-hosting.aspx):



24.    To maintain 99.9% uptime, Go Daddy's services cannot be down for more than 43.2 minutes during a 30-day period of time (43,200 minutes).

25.    Go Daddy advertises a "99.999% uptime guarantee" for its Premium DNS Manager (http://www.godaddy.com/domains/dns-hosting.aspx):



26.    Go Daddy describes its guarantee as follows:

If Premium DNS is down more than .001% of the time in any given month, the customer will get a service credit in the amount of two (2) months for any affected services. Please see Premium Terms of Service Agreement for further details.

27.    To maintain its guaranteed 99.999% uptime for its Premium DNS, Go Daddy's servers cannot be down for more than 25.92 seconds during a 30-day period of time (2,592,000 seconds).

28.    To maintain its guaranteed 99.9% uptime for web hosting and e-mail services, Go Daddy's servers cannot be down for more than 2,592 seconds (43.2 minutes) during a 30-day period of time (2,592,000 seconds).

29.    Upon information and belief, even if a Go Daddy server needs to be replaced, updated, or repaired, Go Daddy can maintain its stated uptime for a customer by utilizing backup, alternate servers, and/or other redundant systems.

30.    Upon information and belief, some of Go Daddy's competitors guarantee 100% uptime and availability.

31.    On September 10, 2012, Go Daddy's servers went offline resulting in a failure by Defendants to provide DNS, web hosting, and e-mail services to its customers, including Plaintiff.

32.    The practical result of Defendants' actions was that websites, such as Plaintiff's http://www.statedincomeisback.com, were unavailable to the public, i.e., Plaintiffs' actual and prospective contacts.   In addition, Plaintiff and the Class were unable to receive and/or transmit emails via their Go Daddy email accounts.    This caused interference, damage and financial loss to Plaintiff and the Class.

33.    Go Daddy's Twitter (@GoDaddy) posted a message at 10:35 a.m. PST on September 10, 2012 stating "Status Alert: Hey, all. We're aware of the trouble people are having with our site. We're working on it."

34.     Go Daddy posted another message on its Twitter account at 12:06 p.m. PST stating "So many messages, can't get to you all...Sorry to hear all your frustration. We're working feverishly to resolve as soon as possible."

35.     Go Daddy posted another message on its Twitter account at 1:04 p.m. PST stating "Update: Still working on it, but we're making progress. Some service has already been restored. Stick with us."

36.     Go Daddy posted another message on its Twitter account at 2:07 p.m. PST stating "We're continuing our work to get back on track. This is our #1 priority. We'll keep posting updates here. Thanks for all the support."

/ / /

/ / /

37.     Go Daddy posted another message on its Twitter account at 3:16 p.m. PST stating "Update: More progress has been made. We're still investigating and working, though."

38.     Go Daddy posted another message on its Twitter account at 5:18 p.m. PST stating "Most customer hosted sites back online. We're working out the last few kinks for our site & control centers. No customer data compromised."

39.     Go Daddy posted another message on its Twitter account at 9:32 a.m. PST stating "Good morning, everyone. Thanks for your support yesterday. We posted a message about the outage: http://x.co/gdupdate – Not an attack."

40.     In all, Go Daddy's DNS and web hosting services experience more than six hours of downtime.

41.     On September 11, 2012, Go Daddy posted a notice at the top portion of their website stating "Yesterday, GoDaddy.com and associated customer services experienced intermittent service outages.  At no time was any sensitive customer information, such as credit card data, passwords or names and addresses, compromised.  Read More".

42.     After clicking the "Read More" link, Go Daddy posted a message titled "CEO Addresses Sept. 10 Service Outage" stating the following:

Go Daddy Customers and Community,

We owe you a big apology for the intermittent service outages we experienced on September 10th that may have impacted your website and your interaction with GoDaddy.com.

The service outage was due to a series of internal network events that corrupted router data tables. Once the issues were identified, we took corrective actions to restore services for our customers and GoDaddy.com. We have implemented measures to prevent this from occurring again.

At no time was any sensitive customer information, such as credit card data, passwords or names and addresses, compromised.

Throughout our history, we have provided 99.999% uptime in our DNS infrastructure. This is the level of performance our customers have come to expect from us and that we expect from ourselves. We pride

ourselves on providing world-class service — through our products, our site experience and customer care.

We have let our customers down and we know it. I cannot express how sorry I am to those of you who were inconvenienced. We will learn from this.

I'd like to express my profound gratitude to all our customers. We are thankful for your straightforward feedback and the confidence you have shown in us.

In appreciation, we will reach out to affected customers in the coming days with a good faith gesture that acknowledges the disruption. We are grateful for your continued loyalty and support.

If you have any questions or require further assistance, please call us at 1-480-505-8877.

Sincerely,

Scott Wagner
Go Daddy CEO[8]

43.    In order for Go Daddy to meet its guarantee of 99.999% uptime for Premium DNS after a six hour outage, its servers would have to have uptime of more than 68.49 years (6 hours X 100,000 / 24 [hours per day] / 365 [days per year]) prior to September 10, 2012.

44.    In order for Go Daddy to meet its guarantee of 99.9% uptime for web hosting and e-mail services after a six hour outage, its servers would have to have uptime of more than 250 days (6 hours X 100,000 / 24 [hours per day]) prior to September 10, 2012.

45.    Upon information and belief, the first computer was invented 66 years ago ("ENIAC", in 1946) and the domain name system (DNS) was invented 30 years ago (in 1982).

46.    For the month of September 2012 or any other 30-day period of time, six hours of downtime equals 0.833% of downtime.

47.    As such, even if Go Daddy's servers were up and operating normally at all other times during the 30-day window, its maximum uptime would be 99.167%.

---

[8]  A true and correct copy of the CEO's statement is attached hereto as Exhibit D.

48.    Upon information and belief, the downtime period of approximately 10:35 a.m. to 4:35 p.m. PST (1:35 p.m. to 7:35 p.m. EST) is of the most important times of the day for Internet commerce, especially for business users during the workday.

49.    ZDNet described the outage as follows:

According to one source speaking to ZDNet, Go Daddy's DNS servers are not resolving forcing many websites offline. In many cases, even if the site is not hosted by Go Daddy itself, the DNS servers are down and cannot point the user to the correct page.

* * *

The fallout from the hack or outage -- or whatever it turns out to be -- is already starting to affect ordinary businesses across the world. Not only that, the knock-on effect to Go Daddy as a company could be huge.

* * *

RunningShoes.com chief executive Chad Weinman told ZDNet:

RunningShoes.com was brought down for several hours today by the Go Daddy attacks. Our online retail business is dependent on our site functioning properly in order to conduct daily business.[9]

50.    As noted above, many customers, including Plaintiff and other Class members, lost a significant amount of business during the outage.

51.    The Search Engine Journal reported the following:

Registration and hosting giant, GoDaddy, and its customers spent the better part of the working day on Monday in crisis mode.  Both website and email accounts hosted by GoDaddy were offline for several hours…

Whether or not Anonymous will take official credit for the massive service disruptions, customers world-wide suffered downtime and lost business.

Customer reactions ran high yesterday in commentary on twitter and on various blog posts about the outage.  The comment thread on an article posted on TheNextWeb.com even included calls for a class action lawsuit against GoDaddy for the loss of business for the day…[10]

[9] http://www.zdnet.com/anonymous-hacker-claims-godaddy-attack-outage-hits-millions-7000003925/ (a true and correct copy of the article has been attached hereto as Exhibit E).

[10] http://www.searchenginejournal.com/godaddy-customers-lose-business-during-dns-attack-godaddy/48307/ (a true and correct copy of the article has been attached hereto as Exhibit F).

52.     Plaintiff and Class members paid Go Daddy for services that they did not receive at the guaranteed levels of 99.9 – 99.999% uptime during the relevant payment period.

53.     Plaintiff was a customer of Go Daddy at times relevant to this action and experienced service outages including those relating to domain name service hosting, web hosting, and e-mail hosting.  Thus, as a result of Defendants' actions in failing to meet their guaranteed 99.9 – 99.999% uptime, Plaintiff, like other class members, has been injured, suffered economic harm, and have otherwise incurred damages.

54.     On September 12, 2012 Defendants transmitted emails to certain customers acknowledging Defendants' failure to meet the guaranteed 99.9 – 99.999% uptimes and offering certain "credits" and/or future discounts that those customers could redeem for a mere seven days.  The credit or discount was not automatically provided.   Rather, the consumer receiving the email was forced to take several time-consuming steps to claim any credit/discount.  If the consumer did not take these affirmative steps, they would not receive anything and their bill would not be adjusted.

55.     For instance, some customers were offered a one month credit on certain services subscribed to.  The credit did not apply to all items in the customer's subscription plan and regularly paid for.   For instance, certain upgrades and other items regularly purchased were excluded from any one month credit offer.   Thus, a full one-month credit was not offered nor automatically provided.   Other customers were offered a discount off new services purchased within seven days.   Other customers received no credit or discount.

56.     No release applied to any customer being offered or claiming any credit/discount.

57.     The e-mails reporting the credit or discount offers indicated that it represented Go Daddy's "opportunity to re-earn [customers'] business and trust."

58.   Plaintiff received an email and was only offered the following: "As a result of this disruption, you will receive 30% off any new product or renewal.* **This offer will be available to you for the next 7 days.** Simply place source code **Apology4a** in your cart or mention the code when you call 480-505-8877." *See* Exhibit G attached hereto.  The small-print (7.5 point font) footnote further restricted the "offer" and stated: "Not applicable to ICANN fees, taxes, transfers, premium domains, or Search Engine Visibility advertising budget.  Cannot be used in conjunction with any other offer, sale, discount or promotion. After the initial purchase term, discounted products will renew at the then-current renewal list price. Offer expires Thursday, September 20, 2012 at midnight (Pacific Time)."  Further, the offer of a 30% discount was largely illusory, as Go Daddy routinely offers subscribers discounts on new purchases in the ordinary course of business.  For example, Go Daddy includes as a banner or billing statement or other communications with customers' promotional offers like ("SPECIAL OFFER! SAVE 25% OFF* YOUR ORDER OF $75 OR MORE!" "Use Promo Code gdbba1901."   Thus, while Plaintiff's service was disrupted during the relevant period on September 10, causing injury and damage, the only compensation offered was that contingent on Plaintiff purchasing new and additional services from Defendants within a short seven (7) day window and paying Go Daddy more money. No automatic cash refund was offered to any class member.   This was not compensation for any loss or inconvenience caused but instead a marketing tool.

59.   No automatic cash refund was provided to any class member.

60.   Defendants' limited-time offers are woefully inadequate and have been criticized by customers in various blogs and comments to news stories reporting the credits.

/ / /

/ / /

/ / /

61. For example, an individual with a screen name of Tom Dillon posted the following in the comments section of a <u>Mashable</u> article:[11]

> I own 28 domains registered through godaddy. I have 5 domains that use godaddy for email. All 28 domains use Godaddy as the primary DNS server for name resolution. I have one site that is hosted on godaddy web servers. My Godaddy credit for a day of disaster was $5.99, which Godaddy says is one month's worth of service. I spend a lot more than $72 per year with Godaddy, I don't know how they think that is only worth a $6 credit. The outage was primarily Godaddy's DNS infrastructure failed, so none of my domains could be reached by friendly names. Emails weren't delivered to any of the 28 domains during the outage, because effectively all 28 domains no longer existed. I have learned my lesson from this outage and am moving DNS services to a more robust DNS provider with true fail-over ability. I am considering moving the domain registration too at my next renewal date.

62. Another individual with a screen name of Jill Koenig posted the following in the comments section of the same article:

> I don't want a lame credit of $14.99 for a service that they already failed to deliver on. Why on Earth would I continue to use their hosting after this disaster. It is insulting. Their enormous failure took all of my sites and email down for 4 hours in the middle of business hours on a Monday. Their genius CEO values that at $14.99? He is sorely mistaken and needs to go back to business school. Oh by the way, I'm still on a 6 month hosting credit from their previous failure in working with their laughable DomainBuy department. GoDaddy needs to wake up. I have lost all confidence and plan on moving my entire domain portfolio because they seem clueless at this point.

63. Another individual with a screen name of Mike Bryne posted the following in the comments section of the same article:

> I haven't gotten an email yet but $1 per domain is NOT enough. It's insulting! I would have been happier with just an honest apology and explanation. Because of this insulting "gesture," I'll be moving all of my accounts. 14 domains, 7 shared hosting accounts and 1 virtual dedicated server. That's $1,368.90 they'll be missing from me next year.

/ / /

/ / /

---

[11] http://mashable.com/2012/09/12/godaddy-credits-outage/ (a true and correct copy of the article has been attached hereto as Exhibit H).

## V.    CLASS ACTION ALLEGATIONS

64.    This action is brought as a class action and may properly be so maintained pursuant to Fed. R. Civ. P. 23 and other applicable rules of civil procedure.

65.    **Class Definition**:  The Class sought to be represented in this action is defined as follows:

> "All persons and entities in the United States who were customers of GoDaddy.com between September 10 and 11, 2012 and through which Defendants received compensation, directly or indirectly." (hereinafter, the "Class").

The Class Period dates back one year (or the length of the longest applicable statute of limitations for any claim asserted) from the date this action was originally filed and continues through the present and the date of judgment. Excluded from the Class are: (a) any officers, directors or employees of the Defendants; (b) any judge assigned to hear this case (or spouse or family member of any assigned judge); (c) any employee of the Court presiding over this case; and (d) any juror selected to hear this case.

66.    **Numerosity of the Class.**  Members of the class and subclass are so numerous that their individual joinder herein is impracticable.  The precise number of members of the class and subclass and their addresses are presently unknown to Plaintiff, but is believed to each exceed 1 million people.   The precise number of persons in the class and their identities and addresses may be ascertained from Defendants' records.   Upon information and belief, Defendants possesses this contract information, as evidenced by the notices sent alerting class members to the service interruption and credit/discount offer.  If deemed necessary by the Court, members of the class may be notified of the pendency of this action by mail and/or e-mail.

67.    **Ascertainable Class**. The proposed Class is ascertainable.    The litigation of the questions of fact and law involved in this action will resolve the

rights of all members of the Class and hence, will have binding effect on all class members. These Class Members can be readily identified from business records, billing systems, and other electronic records of the Defendants and other means readily available to the Defendants, and thus by the Plaintiff, through minimally intrusive discovery.   Upon information and belief, Defendants possesses class members' contract information, as evidenced by the notices sent alerting class members to the service interruption and credit/discount offer.   The class is numerous.  Joinder of all class members is impracticable due to the relatively small monetary recovery for each class member in comparison to the costs associated with separate litigation.

68.   **Common Questions of Fact and Law Exist and Predominate over Individual Issues.**  There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. These common questions of law and fact exist as to all members of the class and predominate over the questions affecting only individual members of the class.  These common legal and factual questions include without limitation:

    a.  The cause and extent of the outage;

    b.  whether Defendants acted negligently in failing to properly maintain their computer network for customers in the United States;

    c.  whether Defendants acted negligently in failing to properly safeguard the servers and data network on which Class members' DNS, web hosting, and e-mail hosting services were provided;

    d.  whether Defendants violated industry standards concerning adequate network infrastructure safeguards and backup procedures;

    e.  whether Defendants violated the Arizona Consumer Fraud Act and whether said violations were willful or knowing violations; and

/ / /

/ / /

f.  whether Defendants breached their express or implied agreements with class members by failing to provide service Class members paid for during the outage;

g.  whether Defendants breached express or implied contracts by failing to provide Class members with uptime at the stated, guaranteed, and/or warranted levels;

h.  whether Class members have been damaged, and, if so, what types of damages flowed from Defendants' unlawful conduct.

69.  **Typicality.**   The claims of Plaintiff are typical of the claims of the Class, as the claims of Plaintiff and all Class members arise from the same set of facts regarding Defendants' failure to protect and provide Class members network services.  Plaintiff maintains no interest antagonistic to the interests of other Class members.  The relief sought is common, unitary, and class-wide in nature.

70.  **Adequacy**. The named Plaintiff is an adequate representative of the Class on whose behalf this action is prosecuted.  Plaintiff's interests do not conflict with the interests of the Class.   Plaintiff has retained competent counsel with experience in class action litigation and will prosecute this action vigorously.  As a result, Plaintiff can fairly and adequately represent and protect the interests of the class in that there are no conflicts between their interests and the interests of other class members, this action is not collusive, the named Plaintiff and his counsel have the necessary resources to litigate this action, and counsel has the experience and ability required to prosecute this case as a class action.

71.  **Predominance of Common Issues**. The proposed Class has a well defined community of interest in the questions of fact and law to be litigated.  The common questions of law and fact are predominant with respect to the liability issues, relief issues and anticipated affirmative defenses. The named Plaintiff has claims typical of the Class members. Plaintiff received a form e-mail, which upon information and belief, was sent out *en masse* to all class members, acknowledging

1    the uniform service outage affecting all class members and offering similar, yet

2    inadequate relief.

3         72.   **Superiority of Class Adjudication**. The certification of a class in this

4    action is superior to the litigation of a multitude of cases by members of the

5    putative class. Class adjudication will conserve judicial resources and will avoid

6    the possibility of inconsistent rulings.  Equity dictates that all persons who stand to

7    benefit from the relief sought herein should be subject to the lawsuit and hence

8    subject to an order spreading the costs of the litigation among the class members in

9    relationship to the benefits received.  The economic damages, restitution and other

10   potential recovery for each individual member of the Class are modest, relative to

11   the substantial burden and expense of individual prosecution of these claims.

12   Given the amount of the individual class members' claims, few, if any, class

13   members could afford to seek legal redress individually for the wrongs complained

14   of herein. Individualized litigation presents a potential for inconsistent or

15   contradictory judgments.  Individualized litigation increases the delay and expense

16   to all parties and the court system presented by the complex legal and factual issues

17   of the case. By contrast, the class action device presents far fewer management

18   difficulties, and provides the benefits of single adjudication, economy of scale, and

19   comprehensive supervision by a single court.

20        73.   In the alternative, the above-referenced class may be certified because:

21             a.   The prosecution of separate actions by the individual members of

22                  the Class would create a risk of inconsistent or varying

23                  adjudication with respect to individual class members' claims

24                  which would establish incompatible standards of conduct for

25                  Defendants;

26             b.   The prosecution of separate actions by individual members of the

27                  Class would create a risk of adjudications which would as a

28                  practical matter be dispositive of the interests of other members of

---

the class who are not parties to the adjudications, or which would substantially impair or impede the ability of other class members to protect their interests; and,

    c. Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final and injunctive relief with respect to the class.

## VI.   FIRST CAUSE OF ACTION

### NEGLIGENCE

### (As To All Defendants)

74.   Plaintiff fully incorporates by reference herein all of the above paragraphs, as though fully set forth herein.

75.   The elements of a cause of action for negligence are 1) a legal duty to use due care, 2) a breach of that duty, 3) a reasonably close causal connection between that breach and the plaintiff's resulting injury, and 4) actual loss or damage to the Plaintiff and the Class.

76.   Go Daddy had a legal duty to use reasonable care to maintain stable, continuous, uninterrupted service on its network for its customers.

77.   Go Daddy knew that its customers (including Plaintiff and the Class) relied on it to provide stable, uninterrupted service, including DNS, web hosting, and e-mail hosting services.

78.   Go Daddy markets its services as a reliable service for stable uninterrupted service, including DNS, web hosting, and e-mail hosting services.

79.   It was reasonably foreseeable that if Go Daddy failed to maintain its system / network so as to provide stable, uninterrupted service, including Go Daddy, the customers (including Plaintiff and the Subclass) who used its services for personal and business use, would be injured and damaged, as they would not be able to conduct their affairs and business over the Internet.

80.    On its website and elsewhere, Go Daddy markets its services as reliable, with its CEO recently noting that "[t]hroughout our history, we have provided 99.999% uptime in our DNS infrastructure. This is the level of performance our customers have come to expect from us and that we expect from ourselves."

81.    It was reasonably foreseeable to Go Daddy that customers who use their services for business purposes, such as Plaintiff, would lose business, customers, productivity and efficiency by not being able to publicly hosts its website on the Internet and to immediately access and respond to e-mails in real-time, causing damage and loss.

82.    By their acts described herein, Defendants failed to maintain reasonable care of their network so as to provide uninterrupted service, including DNS, web hosting, and e-mail hosting services, for its customers.  Such conduct breached Defendants' duties to Plaintiff and the Class.  The breach was a direct and proximate result of Defendants' failure to use reasonable care to implement and maintain appropriate procedures reasonably designed to protect against such outages.

83.    As a result of the foregoing, Plaintiff and the Class were injured, incurred loss and are entitled to damages, restitution, injunctive and other relief.

84.    By reason of the foregoing, Plaintiff and each member of the Class are entitled to recover from Defendants damages, the cost of bringing this action (including reasonable attorneys' fees and costs), and any other relief allowed by law and deemed just and equitable in the circumstances.

## VII.  <u>SECOND CAUSE OF ACTION</u>

### VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT

### (As To All Defendants)

85.    Plaintiff fully incorporates by reference herein all of the above paragraphs, as though fully set forth herein.

86.    Each Defendant is a "person" as that term is used by the Arizona Consumer Fraud Act. A.R.S. §44-1521(6).

87.    The services that Defendants provide to Plaintiff and the Class are "merchandise" as that term is used in the Arizona Consumer Fraud Act. A.R.S. §44-1521(5).

88.    Plaintiff and the Class are consumers of the products and services Defendants sell.  Plaintiff's and the Class's transactions are subject to the Arizona Consumer Fraud Act, A.R.S. §44-1521, *et seq.*

89.    Defendants have engaged in the act, use or employment of deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, in violation of A.R.S. §44-1522.  Such acts and practices of Defendants include, but are not limited to, the following:

      a.    Misrepresenting on their web site pages the uptime that a consumer would receive and Defendants' ability to provide that uptime in services;

      b.    Promising on their web site pages that consumers would in fact receive a 99.9 – 99.999% uptime when Defendants lacked the ability to provide a 99.9 – 99.999% uptime;

      c.    Suppressing and/or omitting from their web site pages material facts regarding Defendants' inability to prevent downtime in services.

      d.    Suppressing and/or omitting from their web site pages material facts regarding Defendants' inability to prevent downtime in services due to their own shortcoming in computer system maintenance and controls.

90.    At all relevant times, Defendants reasonably expected others to rely on its suppression and/or omission of such material facts regarding its ability to provide

a 99.9 – 99.999% uptime.  Indeed, as the CEO of GoDaddy admits: "Throughout our history, we have provided 99.999% uptime in our DNS infrastructure. This is the level of performance our customers have come to expect from us  . . ."

91.    Upon information and belief, Defendants' conduct in misrepresenting its ability to provide a 99.9 – 99.999% in uptime for services was wanton and reckless.

92.    Upon information and belief, Defendants' conduct in suppressing and/or omitting material facts regarding its inability to provide a 99.9 – 99.999% in uptime for services was wanton and reckless.

93.    As a result of the foregoing, Plaintiff and the Class were injured, incurred loss and are entitled to damages, restitution, injunctive and other relief.

94.    By reason of the foregoing, Plaintiff and each member of the Class are entitled to recover from Defendants damages, punitive damages, and any other relief allowed by law and deemed just and equitable in the circumstances.

## VIII. <u>THIRD CAUSE OF ACTION</u>
### BREACH OF CONTRACT
### (As To All Defendants)

95.    Plaintiff fully incorporates by reference herein all of the above paragraphs, as though fully set forth herein.

96.    Plaintiff and the Class purchased Go Daddy's services directly from Go Daddy or from an authorized reseller.

97.    Go Daddy generates service revenues from billings to its services account base through monthly hosting and/or other service fees charged either directly to Class members or indirectly through an authorized reseller.

98.    As such, all Class members are either party to an express contract directly with Go Daddy or to an implied contract between Go Daddy and the members of the Class for services.   That Go Daddy has a contractual account with Plaintiff and each class member is evidenced, *inter alia*, by the notices sent alerting

class members to the service interruption and credit/discount offer, as well as periodic billings.

99.   Go Daddy advertises and markets its uptime "guarantee" of 99.9% for all web hosting and e-mail services and 99.999% for its domain name system hosting service.   That guarantee is a term of each class member's contract with Go Daddy.

100.   Plaintiff believes that each class member pays Go Daddy at least $7.00 per month for service.

101.   Plaintiff pays Go Daddy a monthly fee for services pursuant to a contract with Go Daddy.   The contract is subject to the guarantee.

102.   In 2011, Go Daddy publicly reported gross revenues in excess of $1 billion, including the initial registration of domain names.

103.   As such, Plaintiff estimates that Go Daddy earns at least $50 million per month in service revenue.

104.   Plaintiff and the Class ultimately paid these fees.

105.   By purchasing Go Daddy monthly service plans, Plaintiff and the Class entered into contracts with Go Daddy that Go Daddy's computer network would provide nearly continuous service of at least 99.9% uptime, allowing them to direct Internet traffic to their domain name, publicly host their websites on the Internet, and receive and transmit e-mail and other functions without interruption.

106.   By reason of the outage, described above, Go Daddy failed to provide service to Class members at relevant times between September 10 and 11, 2012.   As a result, Plaintiff and the Class were unable to direct Internet traffic to their domain name, publicly host their websites on the Internet, and receive e-mail and other functions for an extended period of time.

107.   During the regular payment period for the services provided (generally monthly), Go Daddy failed to provide the guaranteed uptime of 99.9 – 99.999%.

108.   By failing to provide the uptime previously guaranteed to Plaintiff and the Class during the regular payment period, Go Daddy breached its contracts with Plaintiff and the Class.

109.   As a result, Plaintiff and the Class have suffered injury, been damaged and lost money.  Plaintiff and the Class were charged for and paid for a warranteed level service, but said service was not provided.  Alternatively, by reason of the foregoing, Defendants have been unjustly enriched and should disgorge all amounts Plaintiff and the Class were charged for and paid for, but for which the corresponding service was not provided.

110.   While Go Daddy has offered certain customers a seven-day window to redeem credits and/or future discounts, those offers are, upon information and belief, intended more as an inducement to continue being a customer with Go Daddy or as a marketing ploy to sell new services, versus an good faith offer of compensation for the service loss.  Regardless, Defendants' offer is woefully inadequate compensation even for those class members who receive the offer and are able to redeem the one-month credit or claim a 30% discount on certain new products or renewal before it expires.

111.   By reason of the foregoing, Plaintiff and each member of the Class are entitled to recover from Defendants damages, and any other relief allowed by law and deemed just and equitable in the circumstances.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself as well as those similarly situated, prays for relief and judgment against Defendants, jointly and severally, as follows:

A.   that this Court certify the class and appointing Plaintiff and his counsel to represent the Class in this litigation;

B.   that this Court enter judgment in favor of Plaintiff and the Class, and against Defendants under the legal theories alleged herein;

1         C.     that this Court award damages to Plaintiff and the Class under the legal

2 theories alleged herein;

3         D.     that this Court award restitution to the Plaintiff and the Class;

4         E.     that this Court award reasonable attorneys' fees, expenses, and costs of

5 this suit;

6         F.     that this Court award Plaintiff and the Class pre-judgment and post-

7 judgment interest at the maximum rate allowable by law; and,

8         G.     that the court grant injunctive relief as may be appropriate and mandate

9 that Defendants take reasonable and appropriate care to prevent future service

10 disruptions;

11         H.     that this Court award further relief as it deems equitable, just and

12 proper.

### X.    JURY DEMAND

14     Plaintiff demands a trial by jury for all issues so triable.

15                     Respectfully submitted,

16                     ZIMMERMAN REED, PLLP

17 Dated: September 18, 2012    */s/ Hart L. Robinovitch*

18                     Hart L. Robinovitch, AZ Bar No. 020910
14646 N. Kierland Blvd, Suite 145

19                     Scottsdale, AZ 85254
(480) 348-6400

20                     (480) 348-6415 Facsimile

21                     Christopher P. Ridout, CA Bar No. 143931
*Pending Admission Pro Hac Vice*

22                     Caleb LH Marker, CA Bar No. 269721
*Pending Admission Pro Hac Vice*

23                     RIDOUT & LYON, LLP
555 E. Ocean Boulevard, Suite 500

24                     Long Beach, CA  90802
(562) 216-7380 Telephone

25                     (562) 216-7385 Fax

26                     **Attorneys for Plaintiff**

27

28